IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 13, 2013

## CARLOS JONES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 07-04471     Chris Craft, Judge**

---

**No. W2013-00189-CCA-R3-PC - Filed November 19, 2013**

---

Petitioner, Carlos Jones, was convicted of voluntary manslaughter and especially aggravated robbery, and the trial court imposed an effective forty-year sentence in the Tennessee Department of Correction. Following an unsuccessful direct appeal, petitioner sought post-conviction relief in the Shelby County Criminal Court, alleging multiple instances of ineffective assistance of counsel. The post-conviction court denied relief, and petitioner now appeals the judgment of the post-conviction court, claiming that trial counsel was ineffective in failing to adequately communicate with him prior to trial. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Michael R. Working, Memphis, Tennessee, for appellant, Carlos Jones.

Robert E. Cooper, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Chris Lareau, Assistant District Attorney General, for appellant, State of Tennessee.

## OPINION

### I. Facts and Procedural History

#### A. Facts from Trial

On direct appeal, this court summarized the facts adduced at trial as follows:

On December 11, 2006, Pamela Bogard was at her home on Ledbetter Avenue in Memphis, Tennessee, smoking crack cocaine with her friends. When the group used all of their drugs and were unable to contact their regular drug dealer, Mario Hampton, Bogard's friend Lisa called another drug dealer, the victim, to purchase crack cocaine. When the victim arrived at Bogard's home, he began selling crack cocaine to other individuals who had been trying to contact Hampton. Hampton and [petitioner] eventually arrived at Bogard's house a few hours later. Bogard overheard Hampton complaining that the victim had sold crack to individuals on his "dope track." Hampton did not confront the victim face to face; instead, [petitioner] relayed messages by walking back and forth between Hampton, who was in the kitchen, and the victim, who was in the living room. Bogard said that Hampton told [petitioner] that he needed to find out how much "dope" the victim had on his person and that they should "take that [m—— f——'s] money." Bogard said that Hampton had a gun that he placed on the kitchen table when he first entered her home. The victim ultimately left Bogard's home because he believed that Hampton and [petitioner] were attempting to start a fight with him.

Bogard saw Hampton and [petitioner] quickly leave her home immediately after the victim left. She later heard gunshots but did not call the police. Minutes after the gunshots, Hampton walked back into Bogard's home to get his girlfriend, Latasha Rankins. As Rankins was getting into Hampton's car, [petitioner] told Rankins that [petitioner] had "got[ten] that [n—][,]" which she understood to mean that [petitioner] "had robbed" the victim of his drugs. She said that [petitioner] acknowledged shooting the victim but did not say that he killed the victim. Rankins stated that [petitioner] was wearing "[a] black shirt with dice on it" that night. Hampton and Rankins took [petitioner] home and then drove to Bow Street where Hampton collected some shell casings that were in the street.

Orlando Carradine drove the victim to Bogard's home on Ledbetter Avenue to conduct the drug deals on December 11, 2006. Carradine was the victim's driver because the victim did not have a valid driver's license. Carradine had been driving for the victim for over a year in exchange for drugs, money, and food. Carradine was in Bogard's kitchen when Hampton and [petitioner] entered the home. He heard Hampton say that the victim was selling crack on "his turf." Carradine observed the victim talking to [petitioner], but he did not hear Hampton or [petitioner] make any threats to the victim.

When Carradine and the victim left Bogard's home, they picked up some chicken and went back to their house to eat with friends. Approximately forty-five minutes later, someone called the victim and asked him to return to Bogard's home so that he could purchase some crack cocaine. Carradine drove back to Bogard's home with the victim in the front seat and Carradine's cousin, Jarrod Johnson, in the back seat. When they arrived at Bogard's house, [petitioner] approached the car and informed them that the buyer was on his way. Only minutes later, Hampton arrived and pulled his car behind the vehicle that Carradine was driving. Shortly thereafter, an SUV stopped in front of Bogard's home. [Petitioner] spoke to the individual driving the SUV, and the SUV left. [Petitioner] got into Hampton's car and talked to Hampton before walking to the victim's car. [Petitioner] then told the victim that he would take him to the buyer's home. [Petitioner] got in the backseat of the victim's car, and Carradine drove a short distance down Ledbetter Avenue until [petitioner] told Carradine to stop the car. [Petitioner] gave the victim seven dollars for a piece of crack cocaine. [Petitioner] indicated that he was going to sell it to the buyer for twenty dollars so that he could make some money from the deal. As he was getting out of the car, [petitioner] suddenly informed the victim that he "want[ed] it all." Carradine heard a "click, click" sound and saw that [petitioner] had a gun that he believed was a nine millimeter. Carradine also saw [petitioner] take all the victim's crack cocaine, which was worth approximately two to four hundred dollars as well as the seven dollars that he had just paid the victim. The victim grabbed [petitioner]'s gun, and they began fighting over it. During the struggle, the victim forced Carradine out of the vehicle and onto the street. Carradine then heard five gunshots fired. He saw [petitioner] fire two more shots as he ran away from the car. Before Carradine could lift himself from the street, the victim drove away in the car. Carradine hid in some nearby bushes and saw Hampton drive by and pick up [petitioner]. He also observed Hampton and [petitioner] collecting the shell casings left in the street. That afternoon, Carradine gave a statement to the police about the incident and identified Hampton and [petitioner] in a photo spread. Carradine also identified [petitioner] as the individual who shot the victim at trial.

Jerrod Johnson was in the backseat of the victim's car at the time that the victim was shot. Johnson rode with the victim and Carradine when they went to Bogard's house for a drug sale in the early hours of December 11, 2006. Johnson said that he became concerned when a car pulled in behind them and a SUV stopped in the street. [Petitioner] got in the backseat with Johnson and asked for a ride to his grandmother's home. Johnson said that

[petitioner] had on "[a] black skull cap, black shirt with dice on it, with black pants." [Petitioner] told Carradine to stop the car and asked the victim "to serve him something for seven [,]" which meant that [petitioner] was asking the victim to sell him some crack cocaine for seven dollars. When the victim pulled out his bag containing the drugs, [petitioner] pointed a .380 caliber gun at him and told him to give him all of his drugs and money. Johnson said that the victim gave [petitioner] his seven dollars back and the bag "containing a stack of rocks" of crack cocaine, and [petitioner] told him that he wanted all of the victim's money as well. The victim refused, and [petitioner] and the victim began struggling over the gun. [Petitioner] began shooting inside the car. Johnson said that Carradine fell out of the car, and Johnson believed that Carradine had been shot. Johnson was frozen with fear during the shooting, and the victim moved over into the driver's seat and attempted to drive away. As the victim began to faint, Johnson helped the victim move to the passenger side and then drove him to the hospital. The police took Johnson into custody while at the hospital. Johnson gave a statement to the police but did not identify [petitioner] in the photo spread. Johnson claimed that he failed to identify [petitioner] on the photo spread because he was too nervous to read the photo spread sheet. At trial Johnson identified [petitioner] as the individual who shot and robbed the victim.

Christy Parks was a passenger in the SUV that stopped outside of Bogard's house on Ledbetter Avenue in the early hours of December 11, 2006. Parks said that her friend, Desmond Woods, was driving the SUV and intended to buy some drugs at that house. She said Woods followed Hampton's car after it backed out of the driveway and drove away. When Parks and Woods stopped near Bow Street and Leacrest Avenue, Parks heard gunshots coming from the vehicle behind them. Parks saw someone firing a gun in the car and then saw a man fall out of the car. Then she saw the shooter run to Hampton's car and get inside. Parks said that the shooter was wearing "some dark colored clothes and a hat with the strings . . . at the end of it."

The following day, Parks was with Woods, Woods's girlfriend, Hampton, and Hampton's girlfriend when Hampton was arrested. Parks gave a statement to the police, but she was unable to identify the shooter in a photo spread. After the police released them, Parks and Hampton's girlfriend, Latasha Rankins, went to Hampton's parents' house where Rankins got a gun from Hampton's vehicle and gave it to Hampton's father.

Larry Gilliam owned a rental house located at 4217 Bow Street [Gilliam's video testimony]. At sunrise on December 11, 2006, his tenants living at this house contacted him to come to the house. As Gilliam was sitting in his truck in the driveway of the rental home at 6:00 or 6:30 a.m., he saw Hampton drive down Bow Street and stop across the street about two houses away. He observed Hampton exit his vehicle and collect three objects from the street. Hampton then got back in his car and left the area. Gilliam subsequently gave a statement to the police and identified Hampton in a photo spread.

*State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *1-4 (Tenn. Crim. App. Sept. 30, 2010), *perm. app. denied* (Tenn. Mar. 9, 2011).

## B. Procedural History

Petitioner was indicted for first degree felony murder during the perpetration of especially aggravated robbery (count 1) and especially aggravated robbery (count 2). A jury found him guilty of the lesser-included offense of voluntary manslaughter and especially aggravated robbery as charged. The trial court sentenced petitioner to consecutive sentences of seven years at thirty percent release eligibility for voluntary manslaughter and thirty-three years at one hundred percent release eligibility for especially aggravated robbery, for an effective sentence of forty years in the Tennessee Department of Correction.

Petitioner unsuccessfully appealed his convictions. *Id.* He filed a timely Petition for Relief from Conviction and Sentence and, through his attorney, two amended petitions. The trial court held an evidentiary hearing on the petitions, after which it denied post-conviction relief. This appeal follows.

## C. Facts from the Post-Conviction Evidentiary Hearing

At the June 28, 2012 evidentiary hearing, petitioner testified as the first witness. He testified that both his co-defendant at trial and the victim were drug dealers. He stated that the altercation at Ms. Bogard's home was not drug-related but was instead "really a prostitution thing" concerning Latasha Rankins, one of the witnesses at trial. He maintained that during the ensuing "tussle" involving the victim, the co-defendant, and another man, a "gun went off" and the victim was shot. Petitioner testified that the State's theory of the case was that he had purchased drugs from the victim and that he had robbed the victim to recover the money he had paid. He asserted that trial counsel should have acquiesced in his testifying so that he could have adequately explained the events of the night in question. However, trial counsel advised that because petitioner had recently been released from the penal farm, he

should not testify at trial. Petitioner was convinced that trial counsel believed he was guilty or that he had some involvement in the offenses. Further, petitioner stated that trial counsel failed to object to another witness's testimony stating that the basis of his knowledge of petitioner was through their shared time at the penal farm.

Petitioner maintained that he had difficulty communicating with trial counsel. Petitioner did not understand why his investigator did not interview the numerous State's witnesses prior to trial. He complained that trial counsel did not request motion hearings or evidentiary hearings before the trial commenced. Petitioner claimed that he only reviewed "bits and pieces" of the discovery provided by the State but that it was not explained to him. He stated that trial counsel only met with him on two occasions. He contended that when he told trial counsel of his difficulty in understanding the discovery, trial counsel raised his voice and told him "to close [his] mouth and listen." Petitioner also complained that trial counsel did not solicit a plea offer from the State prior to trial.

Petitioner stated that he wanted trial counsel to call Ty Owens, Ms. Bell, Christy Parks, and Desmond Woods as witnesses at trial but that he did not do so. He said that Ms. Bell, whose first name was unknown to petitioner, was at the residence where the shooting occurred and that Mr. Woods would have testified that appellant was not the individual who fired the gun. He also challenged Orlando Carradine's identification of him at trial, advancing that Mr. Carradine viewed a photograph of the victim but identified him as petitioner. Petitioner said that he asked trial counsel to lodge an objection but that counsel assured petitioner he would address it during closing argument but never did.

Petitioner explained that if he had testified at trial, he would have said that the incident was not a robbery or a "turf" issue but instead was a conflict between a prostitute and her "pimp." He gave his explanation of how the victim was shot.

The State called trial counsel as a witness, who testified that he was admitted to practice law in 2000 and that he had handled forty to fifty homicide cases during his career. He described petitioner's case as a "difficult" one with "overwhelming proof of guilt." He characterized the witnesses' testimony as "very consistent in their story." Trial counsel said that the only person who described the incident as "anything other than a felony murder or a robbery was [petitioner]." As such, he believed that the only thing he could do was to convince the jury that the felony was disconnected from the victim's death and hope for convictions on lesser-included offenses. He stated, "[I]n fact, that's what we did."

Trial counsel explained that initially, when he received discovery, he reviewed it with petitioner and explained the potential witnesses against him, the evidence the State intended to introduce, and any potential defenses. He also informed petitioner that an investigator

-6-

would attempt to interview the State's witnesses, as well as any other witnesses petitioner suggested.

Trial counsel stated that he engaged in the "standard discussion" about petitioner's constitutional right to testify and the advantages and disadvantages of each decision. He did not find petitioner to be a very articulate person and, thus, did not think it was in petitioner's best interest to testify. He noted the credibility and appearance of Ms. Bogard, one of the State's witnesses, whose testimony petitioner would have contradicted had he testified. Trial counsel opined that the jury would have credited the testimony of Ms. Bogard and rejected petitioner's testimony, to his detriment. He advised petitioner that it would not benefit him to testify, but ultimately, it was petitioner's decision.

Trial counsel could not recall how many times he met with petitioner but stated that he visited petitioner in jail and met with him at court appearances. As the trial date drew near, the investigator met more frequently with petitioner. Trial counsel testified, "So as far as the number [of meetings], I have no idea. But it was definitely adequate for the representation in this case."

Trial counsel stated that he was not aware of petitioner's complaint regarding the witnesses whom he wanted to testify until petitioner testified at the evidentiary hearing. Trial counsel said that if there were witnesses who petitioner thought were favorable to him and for whom he provided contact information, the investigator would have attempted to locate them.

Trial counsel confirmed that he reviewed the discovery materials with petitioner. He stated that he had a difficult time communicating with petitioner, characterizing him as "a big hardhead" who "had a different opinion on how things should be done and didn't like the . . . legal explanations for why things couldn't be done certain ways . . . ."

Trial counsel recalled that the State offered to settle petitioner's cases for an effective sentence of life in prison plus fifteen years. Petitioner would not accept the offer, and trial counsel stated that he would not have recommended that petitioner accept it because the result at trial could not have been any worse.

The State questioned trial counsel with regard to claims in the second amended petition about which there had been no testimony. With regard to those claims, trial counsel stated briefly that there was no evidence, scientific or otherwise, to support a claim of self-defense and that he agreed to a last-minute amendment to the indictment by the State because he believed that it would pressure the State to go forward with the trial, rather than allow extra time for a re-indictment.

-7-

On cross-examination, trial counsel agreed that the visitor log from the jail indicated that he visited petitioner three times. He emphasized that he felt his investigation of petitioner's case was sufficient but that the witnesses he requested simply could not be located. When asked if a continuance would have been beneficial in locating witnesses, trial counsel responded, "It was about two years . . . from indictment to trial. If we hadn't found them in two years, . . . it would be mere speculation at that point." Trial counsel confirmed that Mr. Woods was listed as a witness, so the investigator would have been tasked with interviewing him if he could be located.

The trial court ordered a continuance of the evidentiary hearing for petitioner's counsel to locate the witnesses he claimed should have been called at trial. At the second hearing date four months later, post-conviction counsel stated that he had been unable to locate Mr. Woods and Mr. Owens.

## II. Analysis

Although petitioner raised six claims of ineffective assistance in his petition for relief, he pursues only one on appeal: trial counsel's alleged failure to adequately communicate with him. Accordingly, the remaining issues have not been addressed on appeal. *See Ronnie Jackson, Jr. v. State*, No. W2008-02280-CCA-R3-PC, 2009 WL 3430151, at *6 n.2 (Tenn. Crim. App. Oct. 26, 2009) ("While the Petitioner raised additional issues in his petition for post-conviction relief, he has abandoned those issues on appeal.").

### A. Standard of Review

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d

160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). As our supreme court held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that petitioner suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing

*Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, petitioner must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

## B. Failure to Communicate Adequately with Petitioner

On appeal, petitioner advances that trial counsel was ineffective in failing to adequately communicate with him and that the failure impeded him from exercising his right to testify and resulted in trial counsel being ill-prepared for trial.

Petitioner argues that having only met with trial counsel three times at the jail, had he wished to testify, he would not have been able to do so because the meetings involved a review of discovery and not preparation of trial testimony. Petitioner stated at the evidentiary hearing that he wanted to testify at trial but that trial counsel advised against it because of his prior record. Trial counsel expounded upon that explanation and added that the State's witnesses were all consistent with each other in their testimony and that petitioner, whom he characterized as inarticulate, would have been the only witness offering contrary testimony. Based on his experience, trial counsel opined that petitioner's testifying would not benefit him and would only work to his detriment when the jury compared his testimony to other witnesses such as Ms. Bogard. However, trial counsel emphasized that the decision of whether to testimony was ultimately made by petitioner.

In its order denying relief, the post-conviction court stated:

> The Petitioner also insists that his attorney should have advised him to testify so that he could have gotten that prostitution theory out to the jury, along with his claim of self-defense . . . . [Petitioner's] version of the facts is completely unsupported by any other witnesses or by the physical proof . . . . The [petitioner's] version also does not support a theory of self-defense. The petitioner elected not to testify [during] his *Momon* hearing at the end of all the proof. The petitioner's testimony during the [evidentiary] hearing lacked credibility and was very inarticulate. The State did not even cross-examine him. As well, if he had testified at trial[,] his criminal record would have come out, and he had just been released from the local workhouse from serving a sentence for robbery twelve hours before the killing. His trial attorney testified that "I thought that with the way the trial had flowed[,] . . . I didn't think that he could benefit himself at all by testifying and would of [sic] only gotten himself convicted. But, and again, . . . it's ultimately his decision." Having

-10-

heard the petitioner testify, this court agrees with his trial attorney's assessment.

We agree with the post-conviction court. That court is in the better position to assess the credibility of witnesses, and we will not disturb the court's determination in this regard. *Dellinger*, 279 S.W.3d at 292). Moreover, petitioner has not demonstrated that he was prejudiced by trial counsel's failure to review his proposed testimony and to assent to petitioner's inclination toward testifying. Because petitioner has shown neither deficient performance nor prejudice, he is not entitled to relief on this claim of error.

Petitioner also argues that "due to his failure to communicate with his client, [trial counsel] candidly admitted that he did not speak to many of the State's witnesses." The record does not support this argument. Trial counsel explained to petitioner in one of the meetings at the jail that an investigator would attempt to locate and interview the State's witnesses, if they would talk to him, and asked petitioner for the names of any other witnesses he thought would be beneficial to his case. At the post-conviction evidentiary hearing, trial counsel was surprised by the claim that petitioner wanted him to call the four witnesses he named during his testimony. He explained that if petitioner had provided the names, the investigator would have attempted to locate and interview them. He also confirmed that because Mr. Woods was listed as a witness on the indictment, the investigator would have been tasked with interviewing him as a matter of course.

In denying relief, the post-conviction court ruled:

The petitioner has produced no witnesses at the hearing [that] he suggests should have been called or interviewed by his attorney during trial[] and has offered no additional proof that was not offered at trial that might have been discovered by a more thorough investigation . . . . Ms. Parks testified at trial for the State. Desmond Woods was listed on the indictment and could not be found by the trial attorney's investigator prior to trial or by the petitioner prior to the hearing on this petition. Ty Owens could not be produced even after this court gave the petitioner several months to locate him, and the petitioner did not know Ms. Bell's first name. She was never produced as well . . . .

The evidence does not preponderate against these findings. It is well-settled that "to succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner failed to do so. Moreover, petitioner has failed to demonstrate that he suffered prejudice as a result of trial counsel's

alleged failure to interview "many" of the State's witnesses. Petitioner is not entitled to relief on this claim.

## CONCLUSION

Based on our review of the record, the briefs of the parties, and the applicable legal authorities, we affirm the judgment of the post-conviction court.

_____

ROGER A. PAGE, JUDGE